## WASHINGTON v. MILLER.

No. 2815.    Opinion Filed January 9, 1912.

Rehearing Denied June 25, 1912.

(129 Pac. 58.)

**INDIANS — Lands — Allotments — Descent and Distribution.** George Washington, a full-blood Seminole Indian, married Cissie, a full-blood Creek Indian, in 1893, to whom were born four children; two of whom died in infancy, before allotment, the third in 1901, while the fourth, Waitie Washington, died November 3, 1907, an unmarried minor, without children or descendants of children. Prior to Waitie's death, his mother separated from his father, George Washington, and took up with Mack Cosar, by whom she had one child, Lillie Cosar. After the separation George Washington remarried, and by the latter marriage had three children, who, with Lillie Cosar, are half-brothers and sisters of Waitie Washington. In July, 1909, Cissie Cosar sold the allotment of her said son, Waitie Washington, to Frank L. Warren by warranty deed, said sale being duly approved by the county court of Hughes county. Warren's grantee brought suit to quiet title against George Washington. **Held:**

First.    Under these facts George Washington did not inherit any estate in and to his son's allotment.

Second.    Section 6 of the Supplemental Creek Agreement, approved June 30, 1902 (Act June 30, 1902, c. 1323, 32 St. at L. 500), was in force and effect at the time the descent was cast in this case, to wit, November 3, 1907, and the terms thereof controlled in the devolution of said estate.

Third.    Section 2 of the act of Congress entitled, "An act to provide for additional United States judges in the Indian Territory, and for other purposes," approved April 28, 1904 (c. 1824, 33 St. at L. 573), did not repeal, by implication or otherwise, section 6 of the said Supplemental Creek Agreement.

(Syllabus by Robertson, C.)

*Error from District Court, Hughes County;*
*John Caruthers, Judge.*

Action by Charles W. Miller against George Washington and others to quiet title to real estate. Judgment for plaintiff, and defendant George Washington brings error. Affirmed.

Charles W. Miller, the defendant in error, plaintiff below, brought suit against George Washington, plaintiff in error, de-

fendant below, and Cissie Cosar and Lillie Cosar to quiet title to 160 acres of land, situated in Hughes county, Okla. It appears from the record that George Washington, a full-blood Seminole Indian, and enrolled as such, and she who is now Cissie Cosar, who is a full-blood Creek Indian and enrolled as such, were married in 1893. Four children were born to them, two of whom died in infancy before allotment, the third in 1901, and Waitie, the fourth, on November 3, 1907, prior to statehood, he being an unmarried minor at the time of his death, and without children or descendants of children. The land in controversy is the allotment of Waitie Washington. The record further shows that Cissie, the mother of Waitie, lived with plaintiff in error, George Washington, for about ten years, when they separated, she taking up with one Mack Cosar, by whom she had one child, Lillie Cosar, who is also a defendant in the action below, but not a party to this action in this court. George Washington, after his separation from Cissie, the mother of Waitie Washington, remarried, and by his second wife had three children, who, with Lillie Cosar, are half-brothers and sisters of said Waitie Washington. Cissie Cosar, on July 16, 1909, sold and conveyed by general warranty deed, duly approved by the county court of Hughes county, the land in question to one Frank L. Warren, who later sold the same to Oscar S. Penny, whose administrator sold it to the First National Bank of Holdenville, which later conveyed it to this defendant in error, who filed his petition to quiet title on May 15, 1911; and on June 14, 1911, plaintiff in error filed his answer, in which he says:

"George Washington, defendant, desiring to facilitate this cause as rapidly as possible, hereby waives the signature of plaintiff or his counsel herein to the petition, and likewise all grounds of demurrer thereto, and for his answer to said petition herein filed, denies," etc., etc. (Record p. 5.)

So that any defect there may have been in the petition by the answer on the part of plaintiff in error has been waived, and no further consideration will be given the assignment of error in which the sufficiency of the petition is complained of. In his answer George Washington sets up all the facts hereinabove enumerated, and admits possession in the defendant in error.

Defendant in error, on the filing of this answer by George Washington, but before answer, plea, appearance or default of either of the other defendants, filed his motion for judgment on the pleadings, as against George Washington only, and the court, on consideration thereof, sustained the same and entered a decree in favor of the defendant in error and against plaintiff in error, quieting the title to said land in said defendant in error, Charles W. Miller. No attempt was made, at the time, to adjudicate any questions in this case as between defendant in error and Cissie Cosar and Lillie Cosar, and no reference was made to them directly or indirectly in the decree entered by the court. From this judgment plaintiff in error appeals.

*Lawson & Semple,* for plaintiff in error.

*Warren & Miller,* for defendant in error.

Opinion by ROBERTSON, C. (after stating the facts as above). There is but one question in this case, viz.: Did George Washington, a full-blood Seminole and the father of Waitie Washington, whose mother was a full-blood Creek, under the admitted facts of the pleadings herein, inherit any estate or interest in the allotment of Waitie Washington? We think the question must be answered in the negative. Section 6 of the Supplemental Creek Agreement, c. 1323, 32 St. at L., page 500, ratified June 30, 1902, was in force at the time the descent was cast in this case, to wit, November 3, 1907. Said section reads as follows, to wit:

"Sec. 6. The provisions of the act of Congress approved March 1, 1901 (31 St. at L. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas, now in force in the Indian Territory; provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation; and provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

Counsel for plaintiff in error admit that said section is controlling of the question under discussion, provided the same is not repealed or nullified by the act of Congress of April 28, 1904 (c. 1824, 33 St. at L. 573), entitled, "An act providing for additional United States judges in the Indian Territory, and for other purposes," section 2 of which reads as follows:

"Sec. 2. All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise, and full and complete jurisdiction is hereby conferred upon the district courts in said territory in the settlements of all estates of decedents, the guardianships of minors and incompetents, whether Indians, freedmen, or otherwise. That the sum of twenty thousand dollars is hereby appropriated out of any money in the treasury not otherwise appropriated, for the payment of salaries of the judges hereby authorized, the same to be immediately available."

In an able and exhaustive brief, which gives, in an interesting and instructive manner, a complete resume of the various enactments on this particular subject in the Indian Territory since 1890, plaintiff in error contends that the last-mentioned act of Congress repeals section 6 of the Supplemental Creek Agreement, *supra*. We cannot concur in this opinion. There is no repealing clause attached to the act of April 28, 1904 (c. 1824, 33 St. at L. 573), and if the said section 6 was repealed, it would be by implication, and the law does not look with favor upon such repeals. Then, too, the act of April 28, 1904, *supra*, is a general act, while the Supplemental Creek Agreement of June 30, 1902 (Act June 30, 1902, c. 1323, 32 St. at L. 500), is a special act, and nothing in the general act can work a repeal of the special act unless the language used, and the objects and purposes intended, permit of no other conclusion. We fully agree with counsel that where two statutes are so repugnant to each other that they can not stand or be construed together, the first in point of time is repealed by the last, if not expressly, then by necessary implication. But we do not agree that there is such a conflict or repugnancy between these two acts. The intent of the lawmaker is to be deduced and gathered from the whole statute and by a comparison of other statutes, *pari materia*.

We must also concede the soundness of the proposition laid down in *District of Columbia v. Hutton,* 143 U. S. 18, 12 Sup. Ct. 369, 36 L. Ed. 60, where it is said:

"Where two acts are' repugnant in any of their provisions, the later act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first. Where two acts are not in express terms repugnant, yet if the later act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."

But a careful examination of these statutes fails to show any such conflict or repugnancy as would warrant us in saying that a repeal by implication of section 6 of the Supplemental Creek Agreement, *supra,* was had. On the contrary, the conflict between the two is largely a creature of the imagination, as an examination of those statutes will readily disclose. The act of April 28, 1904, *supra,* was evidently passed for the sole purpose of taking from the tribal courts their criminal, civil, and probate jurisdiction, and vesting it in the United States courts of the Indian Territory, and by section 2, especially, to set at rest all doubts as to whether or not United States courts could and did have probate jurisdiction, and the act also provided additional facilities in the matter of extra judges and court towns. There was no attempt to provide by said act a new law of descent and distribution. There is nothing in the act that will warrant such an inference or justify such a conclusion. The section of the act of April 28, 1904, *supra,* complained of reads as follows:

"All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedmen, or otherwise."

This part of said section does not repeal any law in force in the Indian Territory except those acts which excluded certain persons and estates from the operation of the laws of Arkansas—and the tribal laws did so to a certain extent—making their misdemeanors, and certain felonies, punishable by the United States laws—which were the Arkansas laws—and bringing their estates within the scope of the Arkansas laws for probate purposes. Cer-

Washington v. Miller.

tainly no other construction can' be given to that part of section 2, while the balance of said section deals with the jurisdiction of the Indian Territory courts; as witness:

"And full and complete jurisdiction is hereby conferred upon the district courts in said territory in the settlement of all estates of decedents, the guardianship of minors and incompetents, whether Indian, freedmen or otherwise."

This gave to the United States courts probate jurisdiction in all those enumerated classes of cases, in some of which jurisdiction had not theretofore been exercised. And, as is well said by counsel for defendant in error in his brief: "It also set at rest any doubt which there might be of a United States court having such jurisdiction." Certainly there is no repeal of section 6 of the Supplemental Creek Agreement in this section. This act of April 28, 1904, *supra,* put in force in the Indian Territory the laws of Arkansas, in certain classes of cases where certain tribal laws had theretofore controlled, but did not in any manner affect the provisions of the special act known as the Supplemental Creek Agreement, of June 30, 1902, *supra.* To hold that it did, would also, in like effect, hold that it would repeal all the restrictions upon alienation of Indian lands; the provisions for special United States courts; all tribal tax laws; all laws forbidding taxing of Indian lands, etc. Indeed; very few, if any, United States laws would be left in force in the Indian Territory, for, as counsel contend, only such laws would be in force as had theretofore been put in force from the Statutes of Ar- kansas.

We do not deem further consideration of this subject necessary. Undoubtedly the devolution of the land embraced in this controversy is controlled by section 6 of the Supplemental Creek Agreement, *supra,* and, such being the case, it is plainly apparent that the plaintiff, George Washington, the full-blood. Seminole father of Waitie Washington, a half-blood Creek, did not inherit any interest in his allotment, and therefore the judgment of the district court of Hughes county should be affirmed.

By the Court: It is so ordered.